UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ADRIENNE BENNETT,

        Plaintiff,

                                            Case number 05-72357

v.                                                  Honorable Julian Abele Cook, Jr.

KEMPER NATIONAL SERVICES, INC., an
Illinois corporation, LUBERMENS MUTUAL
CASUALTY COMPANY, an Illinois Corporation,
BROADSPIRE SERVICES, INC., a Florida
corporation, and PLATINUM EQUITY, LLC,

        Defendants.

_____/

## ORDER

This litigation arises from a challenge by the Plaintiff, Adrienne Bennett, to an administrative decision by the Defendants[1] to terminate her long term disability benefits. On June 14, 2005, the Defendants removed the lawsuit from the Wayne County Circuit of Michigan to this federal court.

There are two pending motions that must be resolved by this Court. The first motion involves a request from Bennett to overturn an administrative decision by the Defendants who

---

[1] The Defendants have been identified as the Kemper National Services, Inc., the Lubermans Mutual Casualty Company, the Broadspire Services, Inc., and the Platinum Equity Company, LLC. According to the pleadings in this cause, Kemper is an insurance company which administers long term benefits coverage for the Henry Ford Hospital System. Lubermans, an insurance company which is affiliated with Kemper, is an insurer of the Henry Ford Hospital Systems' long term disability plans. In October 2003, Kemper changed its name, and is currently referred to as Broadspire, which is presently owned by Platinum.

1

had terminated her disability benefits. The second motion was filed by the Defendants, all of whom seek the entry of a judgment that would affirm their administrative decision which is now being challenged by Bennett.

For the reasons that have been set forth below, the Court will grant the Defendants' motion for the entry of a judgment in their favor, and will deny Bennett's application for relief.

I.

Bennett was employed as a project manager and master plumber[2] by the Henry Ford Hospital System until May 23, 2001 when she left her employment because of an existing disability.  As an employee of the Henry Ford Hospital System, she was provided with medical insurance coverage under a long term disability plan ("Plan")[3].

---

[2]Her job duties involved repetitive sorting, lifting, standing, bending, physical activity, mental acuity, verbal presentations and communications, quick decision making, energetic functions, stamina, attentiveness, mental and physical coordination, and a high level of functional capacity.  In addition, her tasks required memorization, problem-solving, and verbal communication skills.

[3]The Henry Ford Hospital System provided long term disability insurance benefits to its salaried employees. The term, "Disabled/Disability," was defined in this plan of insurance coverage in the following manner:
"Disabled/Disability means our determination that a significant change in your physical or mental condition due to (1) Accidental injury; (2) Sickness; (3) Mental Illness; (4) Substance Abuse; or (5) Pregnancy [that] began on or after your Coverage Effective Date and prevents you from performing, during the Benefit Qualifying Period and the following 24 months, the Essential Functions of your Regular Occupation or of a Reasonable Employment Option offered to you by the Employer, and as a result you are unable to earn more than 60% of your Pre-disability Monthly Income. After that, you must be so prevented from performing the Essential Functions of any Gainful Occupation that your training, education and experience would allow you to perform. Economic factors such as, but not limited to, recession, job obsolescence, pay cuts, and job sharing will not be considered in determining whether you meet the requirements stated in the previous paragraph(s)."

This plan of coverage also acknowledged the allocation of authority in the following

Bennett had suffered from multiple sclerosis,[4] as well as from several other related symptoms, since 1996. On July 2, 2001, Bennett's treating physician, Dr. Robert P. Lisak, determined that she had experienced a relapse in her multiple sclerosis condition, and had also suffered from other problems, all of which were related to her condition and respiratory infections. On the basis of these findings, it was his view that she should cease working immediately, and remain from her job for an indefinite period of time.[5]

On November 22, 2002, Bennett was diagnosed by Dr. Lisak as a patient who had encountered a relapsing remitting multiple sclerosis - a condition which is generally considered to be an incurable disease of the brain and spinal chord. Four days before Christmas in 2002, Bennett was hospitalized for seizures and for an aggravation of her multiple sclerosis disease. Upon her discharge from the hospital, Bennett was transferred to a rehabilitation facility where she was diagnosed with quadriparesis, which reflected an exacerbation of her multiple sclerosis condition, a seizure disorder, and depression.

On January 8, 2003, Dr. Lisak found several limitations in Bennett's ability to sit, lift, carry objects, bend, push, pull, maintain her balance, perform repetitive movements, as well as

---

manner: "We reserve full discretion and authority to manage the Group Policy, administer claim, and interpret all policy term and conditions. This includes, but is not limited to, the right to (1) Resolve all matters when a review has been requested; (2) Establish and enforce rules and procedures for the administration of the Group Policy and any claim under it; (3) Determine your eligibility for coverage; (4) Determine whether proof of your loss is satisfactory for receipt of benefit payments according to the terms and conditions of the Plan."

[4]Multiple sclerosis is a neurological disorder which primarily affects the brain and spinal cord. The disease results in inflamation and damage to the myelin, which provides insulation to the nerve fibers and other pertinent cells in the nervous system.

[5]In his review of Bennett's medical records on behalf of the Defendants, Dr. Gerald Goldberg, concluded that she was disabled.

her ability to work safely with machinery or equipment. Thus, in his assessment of Bennett's overall medical condition, he opined that she should not work on a full-time or a part-time basis.

On April 2, 2003, the Defendants sent a letter to Bennett, who was informed that it was incumbent upon her to demonstrate that she was "prevented from performing the Essential Functions of any Gainful Occupation that [her] training, education and experience would allow [her] to perform." The medical records, which had been submitted to the Defendants by Bennett, were subsequently forwarded to a panel of physicians for an independent peer review of her medical records.

On April 3, 2003, Dr. P.A. Keenan performed a neuropsychological evaluation of Bennett and concluded that she had evidenced difficulties in adjusting to the limitations that had been imposed upon her by the multiple sclerosis. Ultimately, it was his recommendation that she continue to take Copaxone, a medication which is prescribed by some physicians to reduce the frequency of relapses in patients with multiple sclerosis.

Following an interim magnetic resonance imaging scan that was performed on Bennett during the latter part of June 2003, Dr. Lisak, after finding two new lesions in her brain hemispheres, concluded that she had experienced an additional relapse. In his July 11, 2003 "Attending Physician's Statement,"[6] he reported that Bennett's condition had regressed, and reiterated his earlier conclusion about her inability to work. During the following month, the

---

[6]Dr. Lisak was required to complete an "Attending Physician's Statements" for the Defendants as a condition precedent to his patient's receipt of disability benefits. It should be noted that in virtually all of Dr. Lisak's reported assessments of Bennett's medical condition, it was his view that she was disabled.

4

Defendants prepared an "Employability Assessment Report" on August 28, 2003 which included an evaluation of Bennett's medical condition and transferable skills experience. Their conclusions indicated that, notwithstanding her ability to engage in certain sedentary occupations, she was disabled.  As a result, the Defendants determined that she would be eligible to receive permanent disability payments beginning retroactively May 23, 2001, for an initial twenty-four (24) month period.[7]  However, the reviewers of this Report also opined that Bennett was - at the very least - able to perform sedentary work.[8]    In a letter of October 14, 2003,[9] the Defendants advised Bennett of their decision to terminate her benefits. This lawsuit followed.

II.

In her Complaint, Bennett seeks to recover benefits under the Plan pursuant to 29 U.S.C. § 1132(a)(3).[10]  However, compensatory damages, such as an application to obtain disability

---

[7]Bennett's monthly disability payments were calculated by the Defendants to be in the amount of  $3,847.32 .

[8]Bennett filed a petition in an effort to secure disability benefits from the Social Security Administration.  On November 7, 2003, an administrative law judge - following a hearing - determined that she did not possess the requisite residual, physiological or psychological functional capacities with which to perform any sustained level of competitive work activities.  Thus, it was the administrative law judge's conclusion that Bennett, in lacking the ability to perform her past relevant work, was disabled within the meaning of the Social Security Act.

[9]The Defendants' letter included (1) an itemization of the medical records that had been reviewed, (2) evaluations of Bennett's medical condition by the assigned peer physicians, and (3) a summarization of the findings within the Employability Assessment Report.

[10]29 U.S.C. § 1132(a)(3) provides that "(a) a civil action may be brought . . . (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the term of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this title or the term of the plan[.]

benefits, are not recoverable under this statute because they are legal in nature. *Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609, 615 (6th Cir. 1998). On the other hand, equitable relief applies to those petitions, such as requests for injunction, mandamus, and restitution. *Crosby v. Bowater Incorporated Retirement Plan,* 382 F.3d 587, 594 (6th Cir. 2004). Since the nature of the relief that Bennett seeks to obtain is legal in nature, Bennett cannot seek to recover benefits under this Plan or compensatory damages under 29 U.S.C. § 1132(a)(3).

The "arbitrary and capricious" standard of review is appropriate in those cases in which the benefits plan grants authority to an administrator to determine a petitioner's eligibility for benefits or to construe the terms of the plan. *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 381 (6th Cir. 1996). A judicial review under this "arbitrary and capricious" standard is extremely deferential. Typically, a decision by an administrator is upheld if it is determined by the court to be reasonable and rationale in light of the provisions within the plan. *Jones v. Metropolitan Life Ins. Co.,* 385 F.3d 654, 661 (6th Cir. 2004). If it is possible to offer a reasoned explanation on the basis of the evidence, the outcome is not considered to be arbitrary and capricious. *Davis v. Kentucky Finance Cos. Ret. Plan,* 887 F.2d 689, 693 (6th Cir. 1999). Accordingly, the task of a reviewing court is to "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." *McDonald v. Western-Southern Life Ins. Co.,* 347 F.3d 161, 172 (6th Cir. 2003). When evaluating a claim under these circumstances, a court is advised to consider only those facts that were known to the plan administrator when the challenged determination was made. *Yeager,* 99 F.3d at 381.

If there is evidence that an administrator has interpreted the plan, decided what expenses

are to be covered, and is also responsible for the payment of the expenses, these circumstances clearly suggest that a conflict of interest has been created. *Killian v. Healthsource Provident Administrs., Inc.,* 152 F.3d 514, 521 (6th Cir. 1998). If there appears to be a conflict of interest, this issue must be weighed as a factor in determining whether there has been an abuse of discretion by the administrator. *Id.* Under such circumstances, a plaintiff must provide some evidence which would indicate that the plan administrator had acted in bad faith. *Hurse v. Hartford Life and Accident Ins. Co.,* 77 Fed.Appx. 310, 318 (6th Cir. 2003). It should be noted that an administrator of a plan may not arbitrarily refuse to credit a claimant's reliable evidence, such as the opinions of a treating physician. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 (2003). There is neither a requirement for an administrator to give special deference to the opinion of a claimant's physician nor to explain - with any degree of specificity - whenever the evidence, which conflicts with a treating doctor's evaluation, is relied upon in making a final determination of a claim. *Id.* The inclusion or exclusion of a relevant decision by the Social Security Administration is only one factor that this court should consider when seeking to determine if the plan administrator's contrary decision was arbitrary and capricious. *Noland v. Prudential Ins. Co. of Am.,* 2006 U.S. App. LEXIS 13879, 18 (2006). Moreover, an administrator of a plan is not required to incorporate or cite to a decision by the Social Security Administration when rendering its own conclusions. This Court also recognizes that the silence by a plan administrator with regard to a decision by the Social Security Administration does not necessarily mean that it was not considered and evaluated. *Hurse,* 77 Fed.Appx. at 318. Furthermore, a plan administrator's decision cannot be considered to be arbitrary and capricious solely because the Social Security Administration rendered a different decision. *Id.* Finally,

"the mere possibility that a participant in an [Employment Retirement Income Security Act] plan might be able to return to some type of gainful employment, in light of overwhelming evidence to the contrary, is an insufficient basis upon which to support a plan administrator's decision to deny that participant's claim for [Long Term Disability] benefits." *McDonald,* 347 F.3d at 170-71.

III.

In support of her motion, Bennett argues that the medical reports and other related material support her application for relief, noting, among other things, that (1) she has suffered and continues to suffer from multiple sclerosis, (2) the Defendants collectively failed to consider and evaluate the administrative law judge's opinion that she was disabled and unable to work, and (3) the peer reviewers of her medical file failed to explain the bases for their rejection of Dr. Lisak's conclusions. She says also advances the argument that the Defendants' decision to terminate the disability benefits was rendered under their mistaken belief that her neuropsychological test results were inconsistent.  She says that the Defendants erroneously relied upon medical conclusions of Dr. P.A. Keenan who wrote that Bennett, despite being depressed, possessed no real cognitive problems. Bennett says that although the Defendants considered this aspect of Dr. Keenan's report, they failed to give an appropriate evaluation to the portion of his evaluation, in which he specifically reported that she was having difficulties in making adjustments to the limitations of her multiple sclerosis condition.

Bennett also maintains that the Defendants' decision to terminate her benefits was arbitrary and capricious because Dr.Elana Mendelssohn, a physician whose conclusions were relied upon by the Defendants, incorrectly characterized her as having a Class 3 mental/nervous

impairment rating[11] when, in fact, it was - in reality - a Class 4 rating.[12]

Bennett urges the Court to give merit to her position, inasmuch as the Plan accommodates a significant change in a physical or mental condition of a petitioner.  Dr. Gerald Goldberg, another medical doctor whose assessment was relied upon by the Defendants in terminating Bennett's benefits, initially determined that she was disabled.  However, Bennett submits that Dr. Goldberg opined that the objective data did not identify an impairment that would preclude her from functioning in a sedentary capacity.  In her opposition papers, Bennett highlights Dr. Lisak's "Attending Physician Statements." in which he consistently maintained that she (1) was unable to work on either a full-time or a part-time basis, (2) could not lift weight in excess of ten pounds, and (3) could neither stand nor walk for any extended period, and was only permitted to sit for two hours each day with an hourly break of twenty to twenty-five minutes.

Bennett also takes issue with the Defendants' failure to take into account the conclusions of the administrative law judge and the grant of disability benefits by the Social Security Administration.  In particular, she emphasizes that a failure to mention such significant findings in its denial letters is indicative that the Defendants' decision to terminate her disability

---

[11]A Class 3 classification category identifies a person with a "moderate limitation" as being a person who is "able to engage in only limited stress and limited interpersonal relationships."  On the other hand, a Class 4 classification category denotes an individual with a "marked limitation" as a person who is "unable to engage in stress or interpersonal relationships."

[12]The Defendants assert that Dr. Mendelssohn made a typographical error in classifying Bennett with a Class 3 mental impairment status rather than someone within a Class 4 category. However, they note that the limitations within the Class 4 category were utilized by Dr. Mendelssohn in her subsequent evaluation.

benefits was arbitrary and capricious. Bennett further submits that the Defendants acted in an arbitrary and capricious manner because they failed to articulate any explanation for their disagreement with the conclusions of her treating physician. Additionally, Bennett maintains that there was a fundamental conflict of interest which resulted from the Defendants' administration of claims for disability benefits and its payment of expenses pertaining to the disability claims. Hence, Bennett encourages the Court to consider this conflict in determining that the Defendants' acted in bad faith in terminating her disability benefits.

Finally, Bennett submits that the Defendants erroneously contend that they are entitled to an offset of her disability benefits by the amount which she receives in Social Security disability income pursuant to the Plan. Additionally, Bennett cites 42 U.S.C. § 407(a)[13] in arguing that the Defendants are not entitled to an offset or a reimbursement for the Social Security disability income that she already received. Significantly, the Plan does not discuss retroactive offset of payments.[14]

The Defendants disagree and challenge all of Bennett's arguments. They point out that the peer reviews were conducted independently by four physicians, all of whom examined the available medical documentation and rendered their respective evaluations thereafter on the basis of the existing records. The Defendants insist that their denial letter to Bennett provided

---

[13] 42 U.S.C. § 407(2) provides that "[t]he right of any person to any future payment under this title [42 USCS §§ 401 et seq.] shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this title [42 USCS §§ 401 et seq.] shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law."

[14] The Plan provides, in part, that "[t]he monthly benefit payable under this Plan will be reduced by the monthly amount of any Other Income Benefits provided to you for loss of income as a result of the same period of [the disability]."

specific reference to the medical information that she had provided them. Ultimately, each physician, acting independently of the other peer review examiners, concluded that there was no objective evidence which supported her position in this controversy; i.e., that she could not perform sedentary work assignments. Furthermore, the Defendants maintain that Dr. Vaughn Cohan, in his peer review report, detailed all of the evidence which supported his findings, and highlighted the deficiencies in her treating physician's diagnoses and ultimate conclusions.

Finally, the Defendants submit that in seeking to apply the offset provisions of the Plan, they are not seeking to attach, garnish, or in any other way recover the funds that constituted disability payments to Bennett. Rather, the Defendants assert that they are merely seeking to offset their payments to her by the amount of disability income that she currently receives from the Social Security Administration. Additionally, they submit that the omission of the word, "retroactive," from the text within this Plan does not run counter to the notion that the drafters of the language in the Plan did not anticipate reductions in the benefits upon the applicant's receipt of Social Security benefits. *Lake v. Metropolitan Life Ins. Co.,* 73 F.3d 1372, 1377 (6th Cir. 1996).

IV.

The record in this cause clearly indicates that the Defendants who administered Bennett's claim for long term disability benefits, are the parties who are responsible for the payment of those obligations. Therefore, an inherent conflict of interest necessarily existed. However, there is no evidence in this record that the Defendants acted in bad faith. The Defendants' failure to mention the decision by the Social Security Administration does not automatically suggest that the information was never considered by them. Instead, there is

evidence that the Defendants consistently provided Bennett with detailed explanations of their decision.  Additionally, assistance from the Defendants in seeking to obtain Social Security disability payments does not suggest an inappropriate motivation by the Defendants, inasmuch as they informed Bennett that her long term disability benefits would be reduced by any benefits that she received from the Social Security Administration. Furthermore, there is also evidence that the Defendants gratuitously offered Bennett the services of a specialized claims administration company whose expertise was utilized by her while processing the Social Security disability claims. As a consequence and given that Bennett (1) was explicitly or implicitly aware of the offset provision which she has now challenged, and (2) willingly volunteered to rely upon the expert services of this company, the Court finds that they did not act maliciously in helping her to obtain Social Security disability benefits.

     An examination of the record reveals that the Defendants provided Bennett with a thorough explanation of their rationale for administrative decisions.  While Bennett may have multiple sclerosis, it is readily apparent that the Defendants offered a plausible explanation for their ultimate conclusion - namely, she (1) was not "disabled" according to the language within the Plan, and (2) was able to perform certain sedentary duties.  The Defendants are also entitled to a retroactive offset of Bennett's Social Security disability income.  The Plan specifically provides that the monthly amount delineated would be reduced by other income benefits received as a result of a loss of income for the same period of disability.  The benefit amount that Bennett received from the Defendants must necessarily be reduced as of the date upon which she began to receive Social Security disability benefits.

V.

Accordingly, and for the reasons that have been stated above, (1) Bennett's motion to reverse the Defendants' administrative decision must be denied, and (2) the Defendants' motion for entry of a judgment must be, and is, granted.

IT IS SO ORDERED.

Dated: September 29, 2006                                s/ Julian Abele Cook, Jr.
      Detroit, Michigan                                    JULIAN ABELE COOK, JR.
                                                                            United States District Court Judge

<u>Certificate of Service</u>

I hereby certify that on September 29, 2006,  I electronically filed the foregoing with the Clerk of the Court using the ECF system, and I further certify that I mailed a copy to the non-ECF participant(s).

                                                                                                s/ Kay Alford
                                                                                                Courtroom Deputy Clerk